Mr. Gould, you ready to proceed? I am, your honor. Okay. Good morning, and may it please the court. Andrew Gould for the appellant, Jason Fetter. I'd like to reserve three minutes for rebuttal. All right. 35 years ago, the Supreme Court held an Anderson v. Liberty lobby that at the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there was a genuine issue for trial. Respectfully, the district court disregarded that bedrock principle here. We've got limited time, and we understand your briefing makes your dissatisfaction with that ruling very clear, Mr. Gould. I got a number of questions, if my colleagues will allow me. And let me start first by saying thank you very much and commending you for providing us the 28-J letter you did that had the Sanchez case from earlier this week, then Bank case from the Fifth Circuit. That's in the best tradition of the bar to make the court aware of new law, even if it may not be particularly helpful to your client. So again, you're to be commended, and I thank you sincerely for that. I want to echo that, Mr. Gould. It used to be that way back when I was an assistant attorney at a law firm. It was kind of like that. It's not like that so much anymore. So I really also commend you for your candor. I appreciate that. I came from the U.S. Attorney's Office from Houston. And so, although this is a new setting for me, I still have, you know, I defend my client, but I also am an officer of the court. I appreciate that. Yeah, and I think attorneys only help their clients when they are candid with the court because it makes their other arguments stronger. Now, we look at that new case, and it emphasizes strongly that the key to seaman status is the employment-related connection to a vessel in navigation. And in that case, the welder was on a ship for 48 days in one instance, and still the court said, no, because essentially the thing, I mean, I don't know if I'm using the right term, but it was basically in dry dock. It was pulled up and they said, you're just not there. And that seems consistent with the Supreme Court's ruling at Chandris. And here we've got a guy one day on a ship in port, clearly not in navigation. What is it that summary judgment bad about the district court here saying, I'm sorry, but you're under the Longshore and Harbor Act here because you're just not in navigation. So, Judge Jordan, with respect to the seaman question, that only comes into play if you find that Mr. Fetter was a borrowed employee of Maersk. And then it becomes an alternative argument for us that in that case, then he can proceed under the Jones Act because he's a seaman. Again, speaking candidly, it's an alternative argument. And we recognize, especially if this court were to say that Sanchez came out of the Third Circuit, it would be a very difficult case for us to distinguish. And so I want to focus on what is our primary argument, which is, I'm sorry. Well, I'm a little confused because I think maybe I misunderstood you, but I thought analytically, the first thing we had to figure out was whether he was a seaman or not. And then if we who is he employed by? But you're telling me the better way to do it is to figure out is he a barred employee to start with, right? Yes. Yes, Your Honor. That's exactly what we're saying. And so what we're saying is that under this relates to Section 905 of the LHWCA and whether or not he can proceed with his negligence claims under the LHWCA. What the district court here held was that Mr. Fetter was barred from doing so because he was a borrowed employee of Maersk, and by extension, so was Mr. Higgs. And then you get into the alternative argument, which is, OK, even if you find this, can he proceed under the Jones Act? So our position is that you should start first with the employment status question, which is why are there genuine issues of material fact? As you said, our brief does lay out in detail why that is. With the court's permission, just because I do have limited time and the court has our briefing on all the genuine issues. One of the things in reviewing the party's briefs that I think needs to be clarified, especially with respect to the LHWCA, is the application of Section 933I. Why Section 933I is relevant is because that's what 3MC relies upon to get out of this case. And if I can explain kind of some background as to the interplay of how this works, Maersk has said that Mr. Fetter is their borrowed employee, right? And so if you did hear, then that's checkmate for us on the LHWCA claim because we can't proceed. What does 3MC do? 3MC is a little different. They join that argument and they say he's a borrowed employee, but then there's a pirouette and they say, in addition, Mr. Higgs is a borrowed employee of 3MC. 3MC is under contract with Maersk to provide people to help them with the day engineer repair work that needs to be done. Mr. Higgs has got a supervisory role, but he's there working too. When you describe it as a pirouette, you indicate that maybe there's something inconsistent going on. Where's the inconsistency? It's two gentlemen asked to go aboard, serve for a day to get some repairs done while the ship is in port. And the argument is they're both effectively, under the tests, borrowed servants. Maersk is controlling their work. Maersk is giving them the workspace. Maersk is giving them the tools. Maersk is directing them what to do and when to do it and how to do it. Higgs is asking and not doing stuff without the direction of the engineers on the ship. And Fetter is, in turn, doing what he's told by Higgs under the direction of Maersk. So where's the inconsistency? Sure. Very quickly, one thing you said is that Maersk was controlling him. We disagree with that, but the inconsistency is with the applicant. Focusing on that and how is Maersk not controlling them? Maersk really set up the parameters of the entire relationship for both Fetter and Higgs. I know three MC is involved, but ultimately the persons or the entity which is controlling the relationship for both Fetter and Higgs is Maersk, isn't it? Not entirely, Your Honor. And I mean, this again is this isn't a question of factual sufficiency such that if a jury had decided this, where are we? It's whether a reasonable juror viewing the evidence in the light most favorable to Mr. Fetter, could a reasonable juror have said, no, Maersk was not his employer. And our position is that, yes, and that there is evidence in the record. And we would point to especially the chief mate's report from Mr. Zimmerman, where he says Fetter came aboard, quote, to work for three MC and he was assigned a job by Higgs of three MC and that as assigned by Greg Higgs and quote, under their own direction. Now, Maersk comes back and says that these are mistaken characterizations, but that's a jury argument. Well, is it? There you go. The important question there, because you're right that the standard we've got to ask is could any reasonable juror look at this body of evidence and find as a matter of fact that these people were not borrowed servants? And with the enormous weight of the fact that somebody not skilled in these fine distinctions about, and the legal meaning that might get attached to words says a guy from three MC came on board or a vendor came, really constitute evidence that would suffice to allow a rational juror to say these people weren't working under Maersk's direction. They weren't working with at the specific request and under the control of and with the tools and et cetera, et cetera. Would it be enough? In fact, insofar as the vendor is concerned, then you're relying upon the fact that Fetter is at one point described as a vendor. It seemed to me if it were to go to trial and that were to come in, a judge would have to instruct the jury not to take the term vendor as used in that report as having any legal significance whatsoever in the legal status of Fetter as a vis-a-vis Maersk because I think it agreed there's nothing in the record to establish that Mr. Fetter was a vendor. He wasn't selling anything other than I guess you could argue under a Marxian analysis he was selling his labor, but that's clearly not what we're talking about vendors. And that may be Judge McKee and in terms of what comes up at trial. But again, what our point here is that this is a report by the chief mate of the Montana and I get it. I get it that there's the argument that, well, he didn't know what he was talking about when he wrote this report, but that's what he wrote contemporaneously. We also have Mr. Anderson, the corporate representative who testified that we asked him what's the root cause. And he says the day engineers were quote acting by themselves without Greg Higgs there supervise them. So that kind of corroborates the fact that maybe they weren't working under Maersk control. Again, we understand, I understand from your all's questions and from Judge Hayden's opinion, we have an uphill battle to prove, but that's not where we are in terms of summary judgment. What we have is have we presented any genuine issues of material fact when you view the facts in the light most favorable to us. And there are questions on that. And the district court respectfully was repeatedly weighing conflicting evidence and saying, well, if I were essentially, if I were sitting as a 13th juror, here's how I would rule. Well, let me ask you this, Mr. Gould, why don't we, let's look at the evidence. Okay. Let's look at the test. The test includes like, what is the relative nature of the work? And isn't the work here that is being involved, work that is specifically and very precisely required by Maersk, not by anybody else. Maersk says, these are the tasks. This is what's got to get done now. That's the first thing. And that's, you don't dispute that that's all Maersk, right? I don't dispute that. And, but if I can respond, I know my time is up in the fifth circuit. They normally tell me to sit down, but if I can continue, I appreciate that very much. I just want to be cognizant of my time and the courts. So that's right. What you've just said is true that he came aboard to do work for the benefit of Maersk on a Maersk ship using Maersk tools. And that you see that in Maersk's argument where they say, well, this is just like Vanterpool. And so I'm sorry. And also under Maersk's control, there's no question, no reasonable question of fact, is there that, that Maersk was, this had to be done to their satisfaction. This was the job that they wanted to get done. They were going to control to the level of detail they wanted to, this project being completed, right? It's true that it was for the benefit of Maersk, but I respectfully disagree that it was under their control. It was under the control of Mr. Higgs. Mr. Higgs and 3MC were hired, to supervise the day engineers. For Mr. Higgs, he wasn't doing anything without the first assistant engineer. I mean, he was going to the first assistant engineer for approval and permission to proceed. And I mean, he wasn't on that ship just going around doing what Mr. Higgs wanted. He did assign a couple of day engineers to work that stuck valve. But even he wasn't doing like over their shoulder supervision. He went off to do something else. That's correct, your honor. But our view of what Mr. Higgs and 3MC is, is that it was akin to a subcontractor relationship. And that is effectively 3MC was coming aboard as a subcontractor, or necessarily, quote, borrowed employees of the contractor, at least that's not our position. And so again, I understand that there are facts weighing in favor of Maersk in terms of whether Mr. Fetter is a borrowed employee. We simply think that if you view all of these facts, there is a reasonable question about control. And if I can distinguish Vanderpool and Peter, both of cases from this circuit, there, one of the key facts that's missing here is that in those cases, the employees, the plaintiffs there signed a contract that said, and Hess Oil was the defendant in that case that became the borrowed employee. And in both of those cases, they signed a contract saying Hess employee will be directing, controlling and supervising your work. You are not, that was the first provision. The second provision was you are not to take any instructions from a lit win. That's kind of like 3MC, or I guess by the day union here from there. We don't have that type of contract here. And so again, that just raises, this is what distinguishes this case from, well, who was responsible for the working conditions here? Ultimately responsible for the working conditions. We agree it was Maersk. We agree that some of, and we haven't disputed that if you look at the nine Ruiz factors, some of the factors weigh in favor of Maersk. We don't dispute that. What we say is that if you view the remainder of them and especially the most important one, which is control, is there a genuine issue of material fact such that a reasonable juror could say, no, it wasn't Maersk. We think the answer's yes. I very much appreciate the court's time. I didn't fully get into my discussion of 933I, which I'm happy to do on rebuttal. Can I ask just one question about that? Absolutely. Is 933I, would you agree that the extent there's immunity there, it's not Higgs's personally, extends 3MC would have that for suits based on respondeat superior. So that was what I was trying to explain, Judge Jordan. We don't think that's the case. And let explain why that's so. If 933I applies, so 933I applies to bar, the point is to bar an employee from suing a co-employee based on a co-employee's negligence. And so Perrone, the Fifth Circuit case that we've cited in our brief, what the claim there was that Mr. Perrone's co-employee spilled oil on the ground that caused his injury. And so he sued for vicarious liability, right? Here, it's different. And why is it different here? Well, yes, Mr. Higgs is involved, but critically here, 3MC is saying Maersk is the employer of Mr. Higgs. So if that's the case, our position is twofold. First, there can be only one employer for purposes of the LHWCA when it comes to immunity. And in this case- Why is that? What's the authority for that? Why can't there be co-employers? So I think the authority I would cite is, excuse me, it would be Vanderpool and Peter, this court's opinion. So in Vanderpool, this is how the court describes the borrowed employee doctrine. For the doctrine itself is but a means of determining which of two potentially liable actors functioned as an injured employee's actual employer. And then if you go to Peter versus Hess, which is, again, talking about the borrowed employee test, it says, when this test indicates that an entity other than the one that putatively employs a claimant is really the claimant's employer, that borrowing employer has been found to be the claimant's employer under the act, and so on. And so we think those cases stand for the proposition there can be only one employer. So if you find that that's Maersk, so be it. Then Maersk goes out of the case, but not necessarily 3MC. But Judge McKee, let's assume you're right. And let's assume that- Assuming we thought that Higgs and Fetter were both borrowed servants, so Maersk has got out of the case, and Higgs can't be sued personally. He's not liable. Then your assertion is, but that's just for him. And even if there's no liability for him, the fact that there was an accident, and the fact that there was some negligence, doesn't absolve his actual employer, 3MC, and we can get to them. Is that the reasoning? Yes. And let me explain more about why that's so. Well, stop for just a moment. But if we said he's the borrowed servant of Maersk, and we accepted your argument that there can only be one employer, then why is 3MC in the picture at all? Because our amended petition has raised general claims of failure to train and failure to supervise. That relates to 3MC's failure to train Mr. Higgs in terms of his supervision, and their failure to supervise Mr. Higgs in his supervision. These are claims against the company, not against Mr. Higgs. Don't they all spring from the notion that he's 3MC's employer? I'm trying to just follow your logic. You're saying there's an inconsistency in their logic. I'm trying to follow your logic. If we said Higgs was the borrowed servant, and there can only be one employer, and he's Maersk's for these purposes, then aren't you trying to have it two ways by saying, okay, but he could also be the employer of 3MC. And therefore, 3MC is responsible for all failure to etc., etc., etc. So, I mean, isn't your own position one that where you're kind of in it? You got to say, well, he could be an employee of Maersk for some purposes, but also the employee of 3MC. That may be, but I'm focusing specifically on the language as it relates to the LHWCA, and who is the employer for purposes of the LHWCA, not for common law tort actions. And so, but I do want to be candid with the court, because our amended petition does have a vicarious liability claim, where we, I mean, say this as one of our negligence theories, is that the defendants were vicariously liable for their employees. Under cases like Peron, that theory would go away. But we also have other theories that we'd like to proceed on. Okay. I think I got your argument. I very much appreciate the court's extra time, and we would ask that this court reverse and remand. Thank you. Thank you. Judge Fauci, is anything on? Yeah, let me try, just for my clarification, Mr. Bull. Your argument, as I understand it, is that Federer wasn't employed by either Maersk or 3MC. He was hired through the union, but he wasn't performing work for the union. So, the union wasn't his employer either. So, I mean, for clarification, I'm a little confused, because he had to be employed by someone. Who could have possibly been, who could he have possibly been employed by, in this case, if it wasn't Maersk? So, Judge Fuentes, we do think that he was, that we would, our position is that he was employed by the union, and going aboard for just his 10 minutes, he remained an employee of the union. In the alternative, I recognize our brief has said that he's not an employee, he's not a borrowed employee of Maersk or 3MC. In the alternative, we would say that he was, that he's an employee of 3MC, because he was taking directions and supervision from Mr. Higgs. Again, that's our alternative position. Mr. Bull, for pay purposes, who would be writing a check for Mr. Federer? The union would be. The union would, in terms of, the union would be paying, Mr., if the question is, how does, who does Mr. Federer receive his check from, he's going to get the check from the union. If the question is, who pays the union for that, the answer is Maersk. Well, that's the issue. Who bears the financial responsibility for making sure that his work is compensated, and that would clearly be Maersk. Right. And that's Maersk, and we've admitted that that, with respect to that fact, that does weigh in favor of Maersk. But another factor that, in terms of the ability of who's paying, again, you have the fact that the union is the one paying it, and also that he's not paid at an hourly rate. It doesn't matter. Isn't the union paying as a matter of convenience for Maersk? The money, the funds to pay for Mr. Federer actually comes from Maersk. Isn't that the case? The funds to pay, yes. So the, as I understand it, the way that the payment works is that Maersk pays the union for Mr. Federer's day work, and then the union then takes out a certain fee, and then- They take out their union dues, they hold back some taxes, they get their piece, and then they give them the rest. Right? Is there a contract? Yeah. And then, yes, and then they pay Mr. Federer. I can't dispute that. That's how it goes. Again, what we do say is that, again, his checks were written, Mr. Federer's specific checks, the ones that he received, was paid by the union. And again, he would be paid the same amount no matter how long or short- Payment by the union was a matter of convenience for Maersk, but it seems like it was an employer-employee relationship in that, ultimately, Maersk was responsible for paying Federer. Isn't that the case? Ultimately, in the end, Judge Fuentes, again, Maersk would pay the union for Mr. Federer, and then the union would then take out its cut and pay him. So eventually, yes, it does go. That's just what we would say, Your Honors, that's just one factor. And again, the key factor is control. And as I think I've made abundantly clear, and I don't want to talk your ear off, but our position is that, with respect to that key factor, control. Again, it's not if I was sitting as a juror, how would I vote? It's if you view the evidence in the light most favorable to my client as we've presented, have we presented enough such that a reasonable juror could say, no, it wasn't Maersk, maybe it was 3MC. Okay, we understand your argument. So let's hear from Mr., you did reserve some time. Thank you, Judge McKee. Mr. Walsh. Good morning. May it please the court, Your Honors. John Walsh for the defendant, Appelee, Maersk Line Limited. Judge Hayden, in a very well-reasoned opinion, correctly identified the two issues in this case. First, was there a genuine issue of material fact as to the employment if we analyze the case in accordance with the Supreme Court precedent, we look at the burdens of proof. Well, we must establish a prima facie case for summary judgment. Let me ask you a question, Mr. Walsh. I think we got a handle on, you know, the analytical construct here, but is it the case that Maersk paid some maintenance and cure for Mr. Fetter? It is. At the beginning, they paid maintenance, Your Honor, and then they realized it was a mistake. Isn't that classically something that you only pay to Joan Zach Seaman? It is, but if I may cite the Supreme Court case of Southwest v. Gazzone, G-I-Z-O-N-I, the fact that you're mistakenly making a payment on either way does not bind you to the finding. It may not bind you, but I want you to answer Mr. Gould's argument that there's evidence in this record that a rational juror could look at and say, hmm, I got a question of fact here. The fact that there's a couple of Maersk employees who describe Mr. Fetter either as a vendor or as a 3MC employee, that Maersk itself treats him as a Joan Zach Seaman by paying him maintenance and cure. If you look at the record in the light most favorable to Mr. Fetter, should he get a shot at a jury? Is it enough to look at that and say, well, you know what? Maybe they changed their mind, but maybe they thought he was a Joan Zach Seaman, so maybe I should think he's a Joan Zach Seaman. Well, there's two separate issues, your honor. I mean, one is the issue of whether the statement in the personal injury report that he was a vendor affects the issue of the employment relation. The other issue is whether he was a Joan Zach Seaman. That's two separate issues. They're certainly related, aren't they? If you've got somebody saying he's, I mean, go ahead. I'm sorry, I shouldn't interrupt. On the Joan Zach Seaman case, I mean, it's very clear from the PAPI case, P-A-P-I, and the Sanchez case, which the court just recently received, that you have to sail with a ship to be a Joan Zach Seaman. If you don't sail with a ship, you're not a Joan Zach Seaman, and he didn't sail with the ship. So I think that issue can be separately put aside because, and despite the fact that mistakenly they pay maintenance and cure at the beginning, but corrected it later and did pay compensation under the Longshore Act, is irrelevant. It's not material, your honor, to the Jones Act status. As to the vendor status, what I liken it to is that if the chief may called this guy a space alien, I'd want to see a spaceship. In other words, there's got to be some other evidence that the guy was a vendor, that Mr. Fetter was a vendor, and there is no evidence that he was a vendor. He didn't submit an invoice to the ship. He was paid in accordance with a collective bargaining agreement, which is the employment contract. I mean, that was exactly how the payment was made. They were placed under limitations as to who they could hire, and the reason they were placed under limitations is that the union bargained for those limitations so that nobody could cherry pick any of the employees, that every employee in the union would have a shot at the job. So there's no question. Is there, well, when you say there's no question, evidently there was a question in the mind of the person on the boat, more than one person on the boat, who was characterizing the employment relationship. Right, and the question there, Judge, is that enough to go to a jury? I mean, you look at, you know, remember what the court said in Liberty Lobby, I think it was, that if the evidence is so one-sided, you're not precluded from granting summary judgment. It's not like, I remember back in the old days, where if there was any evidence on the one side, you couldn't grant summary judgment. The Supreme Court corrected that and said, look, if the evidence is so one-sided that, you know, it could not go to the jury, then you can grant summary judgment, and the district court is granted some discretion in assessing the quality and the quantity of the evidence. Yeah. And the, you know, that the other, the other issue is, you know, what they raised, what the, the, the, the appellant raises is that the crew members were calling Mr. Fetter, saying that he was working for Mr. Higgs or 3MC. It was true that he was under the direction of Mr. Higgs, but Mr. Higgs was under the direction of the chief engineer and the first engineer, which means that Mr. Fetter was under the direction of the, of the chief engineer, first engineer. Well, that's, let me ask you about that. Did the chief engineer ever give any direction to Mr. Fetter? Not the chief, neither, neither did. No, no, no MRSC employee ever gave any direction to Mr. Fetter, did they? It was all Mr. Higgs. He's the one who told them, this is what you do. He's the one who showed them how to do what you're going to do. And, and he's the one who, having assigned a task and demonstrated what he wanted done to get the was engaged or involved in giving direction in any way, were they? Directly to Mr. Fetter, no, but there was plenty of direction given by the chief, the engineer, the first assistant engineer to Mr. Higgs on, you know, what work had to be done, what tools were going to be used to do it. And he, they also supplied the five engineers to Mr. Higgs. What, what's, what are we to make of the fact that Maersk chooses to hire a third party to do supervision? I mean, they, nobody else made Maersk insert a third party in the process. Maersk decides it's not going to directly supervise these people. It's going to bring somebody else in to do it. Is there, is there any consequence to Maersk for its choosing not to play that direct supervisory role? Well, your honor, what they were doing, we're bringing in additional engineers, additional people who were at the level of the engineers in the engine department. So there was not, there was too much work for the engineers who were already in the engine department to do. This was an opportunity for, you know, the other engineers to take a break. And, and, and they brought in additional engineers to do the ship's work. I, I, I understand the factual background. What I'm trying to get you to engage with me on is, is there a legal consequence to Maersk for deciding, you know, if, if Mr. Higgs weren't on board, this would be a lot simpler case, wouldn't it? If Maersk had brought Mr. Fetter on board through the union and the same things had happened, we wouldn't be dealing with this we're not going to be the directly supervising party here. We're going to get somebody else in to do it. And then we're going to, and then we're going to argue that the borrowed servant doctrine doesn't just go from Fetter to us. It pierces this intermediate layer we chose to put in the mix. So that's why I'm asking you, is there any legal consequence to Maersk deciding, okay, we're not going to do it. We're going to put a third party in charge of, of supervising Mr. Fetter. Under these facts, under these facts, Ron, there is no legal, there's no difference. In other words, if, if, if you're correct, if, if, if, if the five engineers were brought aboard the ship and they were supervised by the first assistant engineer, we wouldn't be talking about this, right? It would be. And so the question becomes, does bringing in Mr. Higgs break the employment relationship with Maersk? And the answer is no. And one of the main reasons is that Mr. Fetter did not acquiesce to any differentiation in the employment relationship. He... Explain what you mean by that. Say, I'm sorry, John. Yeah. Explain what you mean by that, that he didn't acquiesce to any differentiation. Well, if you, if you look at some of the authorities on the borrowed servant, you know, precedent that, you know, one of the, one of the factors in determining whether there is a borrowed servant situation is, does the employee acquiesce to his new employment, acquiesce to the direction and control of the new employment? And if you look at the record, Mr. Fetter really was not sure who 3MC was, whether they were there, his colleague didn't even know 3MC was there. And so there was no acquiescence and therefore there was no break in the employment relationship between Maersk Line Limited and... You're adding up Peter again, our case in Peter, where we looked at acquiescence as one of the elements. Exactly. Exactly. So I'm just going to conclude with, I think Judge Hayden made a very well reasoned decision and she should be affirmed. Thank you very much. You mean Mr. Walsh? Oh, yes. We can hear you. Go ahead. Okay. I just want to try a question for my clarification. So Maersk, if I understand your comments correctly, hired Higgs, who in turn hired Helter. Is that accurate? I'm sorry, Judge. I didn't catch the last part of that question. Supervised Helter, did you not? No. Your Honor, Maersk hired Fetter through the union under the collective bargaining agreement. That was a direct hire, Your Honor. And that's our whole point. All right. So your whole point is that Maersk is completely responsible for Helter's injuries. Our point is that Maersk is Mr. Fetter's employer and therefore immune from tort liability under the Longshore Act. But that's about through workers' compensation. Correct, Your Honor. Okay. Okay. You okay? We'll go to Ms. Perone if there are no further questions. I'm fine. Thank you. Okay. Ms. Perone. Good morning, Your Honors. My name is Joseph Perone. I'm from the firm of Giuliano McDonnell and Perone, and I represent Defendant DiPelle, 3MC Mobile and Mechanical Repair in connection with their role in this incident and their position on appeal that the decision of the district court should be affirmed. I think one of the key structural components that seems to be missing in some of the factual recitation is exactly why Mr. Higgs from 3MC was retained in this particular case. And the primary reason for that was his experience and expertise with a particular type of Warstella engine that is on the Maersk Montana, which is not typical of the rest of the fleet where many of the MEBA union members may work during their regular course of employment. And so Maersk wanted to have someone aboard who could work specifically with that engine and whatever problems they had hired him to do. So why don't you go straight to the issue that Mr. Gould has raised, which is maybe Mr. Higgs can be viewed as a borrowed servant of Maersk and hence the 933i immunity kicks in for him. But that's not a benefit that extends to 3MC. 3MC has got its own liability issues and those liability issues extend beyond the mere fact that they're working on this ship and under the supervision of the assistant chief engineer, whoever it is from Maersk. There's failure to train, there's failure to properly supervise, and et cetera, et cetera. And those are independent wrongs, which ultimately damaged Mr. Fetter. I'm sure I've done a poor job of channeling Mr. Gould's argument, but that's what I understand would be saying, why is he wrong? Well, he's wrong for a couple of reasons, your honor. First, he's wrong because any conduct that happened onboard that ship that Mr. Higgs is involved with, the only way to transcend that over to 3MC is through Respondeat Superior. And if you're cutting the chain of employment and saying that Mr. Higgs is a Maersk employee for what he did on that ship, then 3MC could never be responsible for that in any event. Now stop for a second. Is a failure to train claim a Respondeat Superior claim or is that an independent claim that says, look, there is a wrong and we're not saying you're wrong vicariously, we're saying you're wrong because of what you didn't do that you should have done? It is a Respondeat Superior claim because in the chain of causation, you can only go back so far. And typically an employee training would be necessary for the work. In this particular case, he's not working as an employee. It would be no different than if Mr. Fetter decided to sue California Maritime Institute, who trained Mr. Higgs initially and said, you guys didn't do a good job training him in school. And that's why Mr. Fetter... Well, it would be a little different than if the electoral cause... Yeah, parchment causation would be an issue there, which would not be an issue here. Yeah, I mean, we entertain failure to train claims all the time in different settings. Are they traditionally thought of as Respondeat Superior vicarious liability issues or are they direct liability issues? I believe they're Respondeat liability issues when you're talking about an employee acting, whether he's using that training or not. And just to be clear, there's nothing in the factual record from their expert testimony or anywhere else that raises an training of Mr. Higgs. And this case went to the trial judge for summary judgment after all discovery was complete. And part of that motion was our motion under Daubert to limit certain expert testimony, but there was no expert testimony submitted by Mr. Fetter at any stage that suggests Mr. Higgs was improperly trained or improperly qualified to do the position and job he was hired to do through 3MC and Maersk. And so to suggest that somehow they have a right to raise those arguments at trial, well, that's not how the trial works under the federal rules of civil procedure. You have to put your evidence together. You have to raise a colorable claim and it has to be a colorable basis for it. You can't just show up in court and before the jury say, oh, by the way, Mr. Higgs was not properly trained without having raised it at any point to the discovery phase. And you would need expert testimony to support that. None of that exists here. So to the extent that Mr. Gould would like to argue that there's some 3MC responsibility outside of the work that Mr. Fetter does and did on board the Maersk Montana, there's nothing in the record that would allow the trial court to submit that to the jury. And so I think when you look at Mr. Gould and his client, Mr. Fetter's argument, the argument they're making is, well, we should be allowed to go to the jury and just throw some things against the wall and see if they stick. And the trial judge appropriately took the evidence that was in the case and based on that evidence to which there are no questions of actual fact. But there is evidence. It's not quite fair to characterize Mr. Gould's argument that way because we do have people describing Fetter as a vendor who is paid pursuant to a provision in the Jones Act, the maintenance and cure. So there's something there that might raise an issue of fact. I understand what you're saying and I don't disagree with what you're saying, but to characterize it as just kind of throwing jelly to the wall and seeing how much of it sticks is really not what's happening because he is relying upon certain record arguments. And the issue really is, I think, what Mr. Walsh said, whether or not the quantum of evidence that he has that he's relying upon is sufficient in this day and age, given the rules of civil procedure, to get to a jury and overcome the vast mountain of evidence. On the other side, which would suggest that the liability here is limited to the Law Ensurement Act, can't establish that he's a seaman under the Jones Act and that the borrowed servant doctrine would work not only as opposed to merits, but also to 3C. There's a quantum of evidence that goes in that direction. But I think the issue is whether or not there's enough doing the evidence in light most favorable to Mr. Fetter to get past that quantum of evidence. Your Honor, if Judge McKee, if I could just briefly address that. My point of throwing things against the wall has to do with the argument that 3MC would have separate liability outside of their status as employer with respect to whether Mr. Fetter is a Jones Act employee or not. That's an argument that Maersk essentially controls because they hired Mr. Fetter with respect to 3MC, whether he's a Jones Act employee or he's a Longshore Harbor worker. Fellow seamen are also exempt from suit under the maritime law. They can't sue Mr. Higgs for his conduct if it turns out that Mr. Fetter is a Jones Act seaman. So I don't think that affects any issue that involves 3MC. Okay. Any other questions, Judge Fortes, Judge Jordan? Not for me. Okay, Mr. Gould, you did reserve some time. You're muted, Mr. Gould. I sure am, Your Honor. I apologize. I'd just like to make two points, one legal and one factual. The first, the legal point is with respect to Mr. Walsh brought up Anderson versus Liberty Lobby. That's actually what I led with. And our position and what Liberty Lobby says is it's not a judge's role on summary judgment to weigh conflicting evidence. So that just comes straight from Liberty Lobby. The second point, which is factual, and that relates to that, is what is the evidence in our favor? Because we're not throwing it against the wall. At Appendix 277, the purchase orders, Maersk- Well, hold on. I want you to answer Mr. Perrone's argument. He says, you don't have any argument. You could not even put in front of a jury this independent liability argument under some failure to train assertion, because you've got no factual foundation for that. You'd have to have expert testimony. You don't have it done. Is he right or is he wrong? We disagree with that, Your Honor. I'm sure you disagree, but I'm asking. Sure. Well, but part of that, Your Honor, as he said, they did make a Daubert motion to exclude certain of our expert testimony that the district court did not rule upon because it was mootified. Did it come in? Did any expert testimony come in on the record as to the requirements for training for Higgs? Indeed, was there any evidence about requirements for training? Did the expert get into it at all? I can't say, Your Honor, because the focus below was specifically on this question of really borrowed employer versus borrowed employee. And that was the focus of the motion for summary judgment briefing below. But it sounds like it was also the focus of whatever expert testimony there was and the record development below, right? There is record development. And again, what we would say is that these arguments as to whether or not our expert testimony should come in or out. Well, if you agree with us that it was improper to grant summary judgment, then Judge Hayden is going to have to rule on that Daubert motion. But if you didn't, if this wasn't argued below, it's forfeited, isn't it? I mean, if there's an if there's if this wasn't defended in the district court, if this wasn't something that was put in front of Judge Hayden and said, wait a second, you can't let them out of this case because I got an independent claim against him. And here's my expert testimony that says failure to train. I mean, if you didn't tee it up, you can't tee it up now as a basis for sending it back, can you? Well, you're accurately stating the rules of forfeiture. But we also I So I would respectfully submit that for part of it. It's their burden to move on summary judgment on this. And the focus below was true enough, but it's your burden to preserve issues. If you think you can't let three MC out of this case, three MC can't get summary judgment here. And here's why. I mean, that's that's something that's an argument that needed to be raised and put to the district court, didn't it? I don't think you can. Maybe I'm wrong, but I don't think you can say, hey, nobody ever argued this in front of the district court, but they should have raised it. This is your this is your argument for why summary judgment against three MC shouldn't happen. And shouldn't that have been raised in front of Judge Hayden? Well, with respect to Section 933, I three MC is the one that's relying on it. And respectfully, it's our job here, me coming in here and saying, here is how Section 933 I should apply. We obviously Mr. Brown and I disagree on that. Maybe this is untitled. This is untitled. I think what you're saying, and I'm not, again, correct me if I'm wrong, is that there was an argument made to the district court. I'm not sure there was evidence made to support that or not. And in terms of the independent claim against three MC for failure to train, but given the judges ruling on the Longshoreman Act and the Broad Servant Act and the failure to establish that he was a seaman, she never got to that. She ruled it was moot. And so that part of the case never really proceeded. But you're saying that doesn't establish a waiver. Is that what you're saying? I think that's part. Yes. Judge, we can. I think that that's accurate. I mean, again, the focus of the judge of Judge Hayden's ruling was on what everybody agrees. I'm not here standing here or sitting here saying that the central issue is not the borrowed employee status. That was unquestionably the central issue below. But there were other issues lurking in the background that the court didn't reach. And so obviously, if there's a reversal in remand, the court's going to have to reach it, including their Daubert motion, which has ruled on as moot. So there's ample evidence to send this to a jury, and we're not throwing it against the wall. Mr. Federer is not asking for this court to hold as a matter of law that Maersk was not his employer. All this court, all Mr. Federer is asking is that this court find that given the evidence, viewing the evidence in the light most favorable to him, a reasonable juror could conclude that Maersk was not his employer and let us try it to a jury. We ask that you reverse and remand. Thank you, Your Honors. Thank you to all three counsel. Excellent job. Very, very helpful. And again, I want to reiterate what Judge Jordan started with, Mr. Gould, in terms of commending you for your professionalism and candor. But all three of you, thank you very much for your arguments, for your briefing. It makes our job, I won't say fun, because it's hard for me to find fun in the Jones Act, but it makes it nice to do our job when we have the kinds of representation that the three of you gentlemen have presented. Thank you very much for that. We'll take it under advisement.